IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ JAN 18 2022 ★

BROOKLYN OFFICE

Henning Schwarzkopf,
   Petitioner, Pro se,

v.

United States of America,
   Respondent.

Case No.: 1:21-cr-00117

21-cv-117 (CEP)

## A MOTION REQUESTING EMERGENCY COMPASSIONATE RELEASE PURSUANT TO 18 U.S.C. §3582(c)(1)(A)

NOW COMES Henning Schwarzkopf (Petitioner or Schwarzkopf) to ask this Court to grant him emergency compassionate release pursuant to U.S.C. §3582(c)(1)(A) due to the failure of FCI Fort Dix, where Schwarzkopf is currently incarcerated, to contain COVID-19 outbreaks, the harsh conditions of confinement he is experiencing, his age, and his underlying health conditions.

### PRO SE STATUS

The courts have long recognized that pleadings of pro se litigants must be granted a liberal construction and held to a less stringent standard than those drafted by a trained attorney (Haines v. Kerner, 404 U.S. 519, 520 (1972); and Hill v. Braxton, 227 F.3d 710, 707, 4th Cir. (2002)). Courts are obligated to broadly construe these filings and infer all of the arguments the writing reasonably suggests.

1

FCI Fort Dix, where Mr. Schwarzkopf is incarcerated, is now experiencing its _fifth_ widespread outbreak of COVID-19. Schwarzkopf is housed in building 5812, which entered COVID quarantine due to a positive inmate(s) for the third time on January 6, 2022. Building 5812 joined buildings 5841, 5851, 5811, and multiple buildings on the prison's "East Side," including buildings 5702, 5703, 5711, and 5741. This COVID quarantine has now put on hold necessary medical procedures ordered to Mr. Schwarzkopf. When this Court sentenced Mr. Schwarzkopf, it did not anticipate sending him to the federal prison with the worst track record of managing COVID-19. The history of mismanagement and medical negligence described herein presents extraordinary and compelling reasons for granting Mr. Schwarzkopf immediate compassionate release.

Upon being taken into custody in October, 2020 Mr. Schwarzkopf cooperated and was forthcoming with authorities. He pled guilty to 18:1956, Racketeering and 18:1956(A)(3)(B), Money Laundering and was sentenced to 15-months in prison and one-year of Supervised Release. He self-surrendered to FCI Fort Dix on August 27, 2021. As of this filing, Schwarzkopf's statutory home detention eligibility date is August 6, 2022, with a statutory release date of September 19, 2022.

To understand the immense danger Schwarzkopf faces due to FCI Fort Dix's mismanagement of COVID-19, this Court must understand how widespread and uncontrolled the disease at FCI Fort Dix has been. The prison has experienced _four_ previous

widespread COVID-19 outbreaks since the pandemic began. In fact, FCI Fort Dix is the worst federal prison when ranked by total number of infected inmates. The facility's management of the outbreak has been so devastatingly poor it prompted inquiries from Congress, twice (see Exhibit A). (Note: David Ortiz, former Warden at FCI Fort Dix was reassigned to administrative duties in the regional office in Philadelphia, PA due to FCI Fort Dix's negligence in this matter, and has since retired;) (see Exhibit B).

The first outbreak began in the spring of 2020 and culminated in 40 inmates diagnosed with COVID-19. Over July and August, 2020 case numbers dropped, but on October 18, 2020 an inmate living in Schwarzkopf's housing unit (building 5812) was exposed to the Coronavirus as he worked in close contact with an infected staff member. That staff member passed through FCI Fort Dix's inadequate COVID-19 screening, which consisted of only a temperature check at the beginning of an employee's shift. At some point on October 19, 2020, the infected staff member reported symptoms to prison officials. On the night of October 19, the inmate referred to above and two others also housed in building 5812 were removed and placed in quarantine pending COVID tests.

On October 20, one of those inmates tested positive for COVID-19. Later the same day, the two inmates who had quarantined with the COVID-positive inmate were returned to building 5812. This decision would spread COVID throughout Schwarzkopf's housing unit and launch FCI Fort Dix's second wave of COVID-19.

3

This is especially concerning because while on the East side, inmates from 5812 came into direct or indirect contact with COVID-positive staff. These officers included Moody (Education/Unit officer, COVID-19 positive); Ramirez (Food Service, COVID-exposed); Thibideau (Food Service, COVID-exposed); Sanchez (Food Service, COVID-exposed); Lorenzo (Food Service, COVID-positive).

Throughout February, 2021 fifteen inmates living in Mr. Schwarzkopf's housing unit tested positive for COVID-19. Of those 15, seven had been re-infected with COVID-19 a second time; of those seven, two had been fully vaccinated and one partially vaccinated at the time they re-contracted COVID. This outbreak was a direct result of the decision to send inmates from housing unit 5812 to the East Side to work, exposing them to COVID-19, then returning to building 5812 without any testing. This is just one of many instances of prison officials demeaning the value of inmate life and health and exemplifies why Mr. Schwarzkopf's health is at jeopardy while incarcerated.

Just months after Mr. Schwarzkopf self-surrendered to FCI Fort Dix, in October, 2021 a fourth wave of COVID infection occurred. This began in building 5811 when Fort Dix prison officials transferred new inmates into the housing unit without proper screening. Among these inmates were COVID-positive prisoners, carrying the Delta variant. Despite decent levels of vaccination among 5811's original population, breakthrough cases emerged. For those inmates not vaccinated, infection was guaranteed. The building was on quarantine lockdown for well over

six-weeks with testing occurring once every two-weeks for non-vaccinated inmates only. This wave of infection reinforces the negligence of prison staff and demonstrates the continued danger Schwarzkopf finds himself in due to dangerous decisions, such as the decision to move inmates into building 5811 without proper testing, continually made by prison officials. These same officials transferred new inmates into Schwarzkopf's housing unit (5812) in recent weeks; now an outbreak of Omicron-COVID has taken place precisely because of these poor decisions.

The actions of the prison explained above demonstrates why reasonable jurists across the country have determined that potential exposure, and re-exposure, to Coronavirus and COVID-19 specifically, constitute extraordinary and compelling reasons to grant relief to inmates seeking emergency release. Prison officials have no plan, nor any ability to limit the spread of the virus once introduced into the prison - evidenced by four distinct spikes of COVID-19 at FCI Fort Dix. Furthermore, the prison's screening method - taking staff temperatures prior to their shift - is inadequate and negligent in preventing COVID-19 from entering the prison environment. The prison's inability to properly and effectively manage the disease perpetuates the medical danger Schwarzkopf finds himself in.

## CONGRESSIONAL SCRUTINY OF FCI FORT DIX

Government officials have scrutinized FCI Fort Dix over its management of COVID-19. U.S. Senators Bob Menendez and Corey Booker rejected the BOP's response to their earlier letter presented in Exhibit B, stating the prison's answers to their

9

questions "inadequate," and vowed "to press for additional answers and remedies that will protect the health and safety of incarcerated individuals and staff" (Yi, Karen "NJ Lawmakers Demand Answers on Fort Dix Coronavirus Outbreak." WYNC. 12/4/20). The Senators, understandably, raised particular concerns about the lack of medical care for the many sick prisoners and the absence of cleaning protocols. On January 12, 2021 a second letter was sent to BOP Director Carvajal because the Director had failed to send Senator Booker requested data which he swore under oath to provide in June of 2020 regarding the response to COVID-19 at FCI Fort Dix. An additional letter from the Senators was sent to FCI Fort Dix's Warden David Ortiz (now former Warden), urging him to send more inmates to home confinement. According to the Senators, FCI Fort Dix is among the least safe places to be in the United States.

## EXTRAORDINARY AND COMPELLING REASONS

A cynical court could conclude that the spread of COVID-19 has waned, removing any extraordinary or compelling reasons for compassionate release. As the Fourth Circuit found, this is far from true. FCI Fort Dix is rated a CARE-2 facility, defined as a prison which contracts medical personnel to augment its staff and is located within one-hour of a medical center or hospital. FCI Fort Dix does not employ the staff or medical equipment needed to save Schwarzkopf's life should his condition deteriorate. As the Fourth Circuit found in <u>United States v. Braxton</u>, no. JKB-09-478, contracting COVID-19 increases the severity of a defendant's

10

sentence, "beyond what was originally anticipated" and weighs heavily in favor of a finding of extraordinary and compelling reasons for compassionate release (see also: <u>United States v. Mel</u>, TOC 18-0571, WL 2041674, 4/28/20).

Schwarzkopf's multiple underlying medical issues include leading co-morbidity factors according to the CDC. Yet FCI Fort Dix created a COVID-19 hot spot. In reviewing the sequence of events here, a compassionate court could find that the mismanagement and negligence of FCI Fort Dix's COVID response is in itself an extraordinary and compelling reason to grant Schwarzkopf immediate release.

Mr. Schwarzkopf suffers from multiple medical conditions which heighten his risk for both contracting and suffering negative outcomes from COVID-19. His age, 70, already puts him in the high-risk category. However, as seen in Mr. Schwarzkopf's medical records, and specified by Dr. Ines Graber, MD (see Exhibit C), Mr. Schwarzkopf suffers from oncocytoma due to a partial kidney resection; this condition also causes chronic venal insufficiency. Put more directly, Mr. Schwarzkopf's kidneys do not filter toxins from his urine as well or efficiently as healthy kidneys would. He also suffers high blood pressure, and high cholesterol, which has led to carotid sclerosis, or scarring in this arteries. Mr. Schwarzkopf has a history of stroke.

Medical care at FCI Fort Dix, up to this point, has been minimum at best. Mr. Schwarzkopf is prescribed multiple medications for his high blood pressure and high cholesterol. Despite being deemed a "chronic care" inmate, he has not received

preventive-care, including two CT scans and an ultrasound, used to detect cancer in his kidney, which his lab-reports suggest he may be at risk for, despite multiple requests for the tests (see Exhibit C). Due to COVID lockdowns and limitations on outside-care, Mr. Schwarzkopf's medical needs cannot be adequately met. With the threat of COVID-19 infections, including breakthrough infections of the Omicron variant, Schwarzkopf's future health is in jeopardy.

As verified in Exhibit C, Mr. Schwarzkopf has filed numerous requests to health services, and also filed administrative remedies, seeking his right to proper medical care. The Exhibits show a record beginning on November 5, 2021 and continuing to date, of escalating requests by Mr. Schwarzkopf. These requests fall under three subjects: requests for lab test results; requests for prescribed medication and an explanation as to why the dosage was reduced; requests for the necessary CT scans and ultrasounds ordered by his prison-doctor, Dr. Sood. Each subject is explained in turn below.

Beginning on November 5, 2021 with a follow-up on November 17, 2021 Mr. Schwarzkopf repeatedly requested copies of lab results from three blood and one urine test, as well as medical records of an upper body x-ray. The results of these tests prompted Dr. Sood to order multiple radiology tests including an Echo-Cardiogram, two CT scans and an ultrasound (explained further below). It is a requirement that prison medical personnel provide such records upon request under statute and BOP Program Statement. To date, those records have not been provided.

On November 19, 2021 Mr. Schwarzkopf requested an explanation as to why his prescription for Amlodipine was reduced without notice or consultation to 5mg. Dr. Sood had prescribed 10mg and Mr. Schwarzkopf's personal physician had him on a 7.5mg dose prior to his incarceration. He requires Amlodipine to manage high blood pressure and it is a necessary preventive treatment due to his past stroke. He followed up on November 29, 2021. To date, the dosage has not been adjusted and no explanation provided.

Finally, in this pattern of deliberate indifference to Mr. Schwarzkopf's medical needs, the results of his lab tests indicate a serious problem with his renal function. Dr. Sood ordered multiple tests to follow-up on the lab results including:

- An Echocardiogram (ordered on 9/21/21 and approved on 10/22/21)
- A CT scan of the abdomen (kidneys) (ordered on 9/21/21 and approved on 10/22/21)
- An ultrasound (ordered on 9/21/21 and approved on 10/22/21)
- A CT scan (ordered on 10/21/21 and approved on 11/12/21)
- A nephrology consultation (ordered on 10/18/21 and approved on 11/26/21)

As of this filing, only the CT Scan ordered on 9/21/21 has taken place. Meanwhile, on November 18, 2021 Mr. Schwarzkopf reported to the morning "sick call" due to kidney pain and was told he would be scheduled to see Dr. Sood. That appointment did not occur until January 11, 2022. On that date Mr. Schwarzkopf

13

inquired about the above listed tests and obtaining his medical records. Dr. Sood explained he was doing the best he could given the BOP bureaucracy then ordered new tests after the results of the September CT Scan showed two lesions on Mr. Schwarzkopf's liver. In conversation with his personal physician, she recommended a Bence-Jones Protein test (a test commonly used to detect kidney and/or prostate issues regarding potential cancer) be performed. To date, though Mr. Schwarzkopf has requested such a test, he has not been able to obtain one. The Bureau of Prisons does not willingly "waste" money on preventive care for inmates. Given Dr. Sood's requests for multiple off-site tests, and the approval of such tests by the Health Services Administrator, Mr. Schwarzkopf's lab tests no doubt indicate a serious medical problem. Because FCI Fort Dix has not provided those lab test records to him, he cannot say just how dire the situation may be. However, based on conversations with his personal physician, Mr. Schwarzkopf may have a malignant tumor on his kidney(s). The delay in his worsening care may be due to COVID outbreak and an overwhelmed healthcare system in Burlington County, New Jersey. The state had one of the highest rates of COVID-positive cases due to Omicron. But, even so, the delay demonstrates a pattern of poor and careless medical care dating to the beginning of the pandemic at FCI Fort Dix. This pattern is not only documented herein, but also the focus of a major civil case, <u>Thieme et al v. United States of America et al.</u>, No. 1:21-cv-00682 (D.NJ 2022), and was a major factor in Judge Catherine Eagles decision in <u>United States v. Burr</u>, case no.: 1:15-cr-362-1 (MDNC 2021). Judge

14

Eagles stated, "...the operational failures at Fort Dix...go well beyond the facts shown in compassionate release motions the Court routinely sees." (Burr, Id., Pp. 12-13).

This potential harm is specifically the fault of the negligent decisions made by FCI Fort Dix officials. Such poor decisions continue as evidenced by the current fifth outbreak and lack of widespread testing. The prison continually fails its legal responsibility to protect its inmate population. If Schwarzkopf contracts the Delta-variant, or the now dominant Omicron-variant present in his housing unit, combined with his underlying medical conditions and age, he will be at an extreme risk of a negative, possibly fatal outcome.

In United States v. Rodriguez, 2020 WL 1627331 at *7, the court found that the authority of a court to grant compassionate release has been greatly expanded under the 2018 First Step Act, "the scope of the old policy statement is clearly outdated and, at the very least, does not apply to the entire field of post-First Step Act motions...Therefore the [USSC] policy statement may provide 'helpful guidance' but does not limit the court's independent assessment of whether 'extraordinary and compelling reasons' exist under §3582(c)(1)(A)." (See also McCoy v. United States, 2:03-cr-197, 2020 U.S. Dist. LEXIS 91801). Petitioner believes that Braxton, combined with Rodriguez, with the court's considerations of FCI Fort Dix's ineptitude in protecting him, and his co-morbidity factors, warrant compelling and extraordinary reasons.

In addition to Braxton, supra and Rodriguez, supra., other

courts have found that conditions of confinement warrant extraordinary and compelling reasons for a reduction of sentence. See United States v. Hatcher, 2021 WL 1535310; No.: 18-cr-454-10 (SDNY 2020), finding prolonged prison lockdowns warrant extraordinary and compelling reasons for a sentence reduction: "...it is also true that courts reviewing motions for sentence modifications have considered the extent to which onerous lockdowns and restrictions imposed...have made sentences 'harsher and more punitive than would otherwise have been the case'." Id. See also United States v. McRae, No.: 17-cr-643 LEXIS 8777 (SDNY 2021); and United States v. Reiter, No.: 87-cr-132 LEXIS 72899 (SDNY 2021).

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

As shown in Exhibit F, Schwarzkopf filed for compassionate release with his warden on December 8, 2021. To date, he has received no response. Given the emergency nature of this compassionate release request, Schwarzkopf believes he has exhausted his administrative remedy process pursuant to United States v. Haney, 454 F.Supp. 3d 316 (EDNY 2020); United States v. Poulions, 2020 WL 1922775 at *1; United States v. Jones, 2:11-cr-249-MHL at *2; and United States v. Robinson, 3:10-cr-261 E.D. Va. as more than 30-days have elapsed since filing his request.

## RELEVANT §3553(a) FACTORS

Courts have acknowledged the circumstances at Fort Dix demand the release of prisoners there. Courts across the country recognize that circumstances serve as a powerful rebuttal to

boilerplate Government arguments that the BOP can maintain the safety of prisoners and staff at FCI Fort Dix. In November 2020, one court granted a renewed motion for release after having denied the prisoner's motion in August, because of "the failure of the Bureau of Prisons to prevent and control a COVID-19 outbreak at FCI Fort Dix," which, "substantially diminish[es] his ability to provide self-care" (See <u>United States v. Mongelli</u>, 2020 WL 6449237, at *3 [internal quotations omitted]). That court specifically noted that Mr. Mongelli would, "be better able to access whatever care and treatment he may require in the future if he is not incarcerated" at FCI Fort Dix. This Court should similarly consider the circumstances and mismanagement of COVID-19 at Fort Dix when weighing §3553(a) factors.

Besides the <u>Mongelli</u> case, other District Courts have granted release for men at FCI Fort Dix even where other factors counseled hesitation, including for people who have tested positive for COVID-19 and those vaccinated. Some of these cases include <u>United States v. Hernandez</u>, No. 7:19-cr-649 (S.D.N.Y. 11/18/20); <u>United States v. Jansen</u>, No. 1:08-cr-132, 2020 WL 6946504 (S.D. Ind. 11/25/20, allowing a 39-year old sex offender compassionate release); <u>United States v. Smith</u>, No. 14-20814, 2020 WL 6822831 (E.D. Mich. 11/20/20, granting release after an initial denial to an individual convicted of child pornography); and <u>United States v. Elliot</u>, No. 3:17-cr-51, 2020 WL 6874869 (D.N.J. 11/23/20).

In <u>United States v. Vega</u>, the Eastern District of New York granted compassionate release to a COVID-positive inmate at FCI

17

Fort Dix and faulted, "the failure of the Bureau of Prisons to prevent and control a COVID-19 outbreak at FCI Fort Dix" (U.S. Dist. LEXIS 226178, at *9-10, E.D.N.Y. 12/2/20). This court granted release despite Vega's role as a, "major figure...in this horrendous drug operation which caused murder, maiming, kidnapping and destruction." The Vega court and other examples granted compassionate release to high-risk petitioners precisely because of the conditions at Fort Dix. The Elliot, supra. court relied solely on the change in circumstances at FCI Fort Dix to grant a renewed motion, noting that, "cases of COVID-19 at Fort Dix have increased at an extraordinary rate" (See Elliot, 2020 WL 68882244 at *2).

Of particular note is Judge Catherine Eagles decision in United States v. Burr, Case No.: 1:15-cr-362-1 (finding failures at FCI Fort Dix were so extreme a sentence reduction was warranted even though defendant did not meet all §3553(a) factors). Defendant Burr was serving a 240-month sentence and lives just down a hallway from Schwarzkopf. Judge Eagles was so appalled by the decisions of FCI Fort Dix officials she reduced the sentences of three defendants (including Burr, Id) all of whom live in Schwarzkopf's housing unit.

The point here is that the various 3553(a) factors soon to be discussed must be considered relevantly to the danger FCI Fort Dix poses to Schwarzkopf. In the cases cited above, courts found that FCI Fort Dix's negligent mismanagement of COVID-19 clearly outweighed the 3553(a) factors in each defendant's case. And these defendants committed serious, violent crimes with longer

18

criminal histories than Mr. Schwarzkopf.

§3553(a) requires courts to ensure defendants' sentences are, "sufficient but not greater than necessary" to ensure public safety and fulfill the necessary needs of justice. The challenge for any court is to therefore balance the interests of the public with upholding a defendant's sentence in the face of a potentially life-threatening disease. As the Southern District of New York found in <u>Hatcher</u> and as the Fourth Circuit found in <u>Braxton</u>, COVID-19 makes a defendant's sentence more severe and "beyond what was originally anticipated."

Regarding §3553(a), several considerations must be given weight in favor of granting Mr. Schwarzkopf's compassionate release. The statute protects against sentences which are "...greater than necessary" while ensuring justice. Of note here are changes in law under both the First Step Act and the CARES Act revising requirements for early release for elderly offenders. Mr. Schwarzkopf will be eligible for early release under the elderly-release program in March, 2022. His home-detention eligibility date is August 6, 2022. Subsequently, granting compassionate release, or re-sentencing to home confinement does not violate the spirit of §3553(a), specifically §3553(a)(2)(A), (B), (D), and §3553(a)(4). Certainly, granting compassionate release cannot go against the intent of the relevant section when, by statute, Mr. Schwarzkopf is eligible for home detention in just a few months time.

Specifically to §3553(a)(1), Mr. Schwarzkopf has no prior criminal history, assisted investigators to the best of his

19

ability, and poses no future danger to the public. Mr. Schwarzkopf is a highly regarded attorney in Germany, where he lives with his wife. He has already agreed to and signed a deportation order, which would take effect as soon as his sentence is complete. No evidence suggested Mr. Schwarzkopf was an organizer or leader in the instant offense; the crime was non-violent and there are no named individual victims. Further, he is not a flight-risk, possesses no passport, and demonstrated compliance with all legal requirements during the nine-months he spent on home confinement while on pre-trial.

Courts often weigh whether compassionate release conflicts with aspects of §3553(a) notably parts (B), (C), (D), and §3553(a)(6): to promote respect for the laws; to provide just punishment for the offense; to protect the public; and to prevent unwarranted sentence disparities. Courts also must consider jurisprudence within the District and Circuit. Mr. Schwarzkopf's instant offense was wrong, his behavior and actions improper and, ultimately, illegal. But when comparing his criminal behavior with other defendants who have received compassionate release, the characteristics of his offense pale vis-a-vis §3553(a) factors.

Two specific examples illustrate this point. The Southern District of New York granted compassionate release in United States v. Rodriguez, No.: 00-cr-761 LEXIS 181004 (2020) and in United States v. Reiter, No.: 87-cr-132 LEXIS 72899 (2021). Defendant Rodriguez had received a life sentence after participating in a murder; defendant Reiter was convicted of RICO

violations, possessing and distributing heroin and three murders. He received two life sentences plus 60-years. Yet this Court's sister district determined, "...the pandemic...has made [the defendants'] incarceration harsher and more punitive than would otherwise have been the case," Rodriguez, supra. The point is twofold: First, in comparing Mr. Schwarzkopf to other criminal defendants with favorable jurisprudence, no court should claim his instant offense is too egregious to be given compassionate release. Second, in order to uphold the concept of jurisprudence, proper weight must be given to cases such as those specified above. If murderous drug dealers and mafia members can receive compassionate release because of the negligent decisions made by prison officials, the conditions of their confinement, and the risk to their health, than Mr. Schwarzkopf, a first time non-violent offender, should also qualify under §3553(a).

## RELEASE PLAN

If this request is granted, Mr. Schwarzkopf will live with Ms. Christine Davies, widow of esteemed federal judge William Hoeveler at 4152 Battersea Road, Miami, Florida 33133. Ms. Davies has been a lifelong friend of Mr. Schwarzkopf and Ms. Davies has submitted a letter to the Court, found in Exhibit G. Mr. Schwarzkopf has medical insurance through the German National Healthcare system and can receive proper care for his kidneys and and his other medical needs. He will reside in Miami until his sentence is completed and/or he is deported back to Germany.

## CONCLUSION

## CONCLUSION

It was never this Court's intention to endanger Mr. Schwarzkopf's health, but FCI Fort Dix, where Schwarzkopf is incarcerated, is a COVID-19 hot-spot. This Court surely did not intend to send Schwarzkopf to the wolves, designated to the federal prison with the worst track record on proper COVID protocols and response in the country. This Court has the power to decide whether Schwarzkopf's health and well-being are worthy of protection, or whether, when this Court sentenced him, it believed a high-risk of contracting COVID a punishment worthy of his crime. Does serving the remaining eight-months of his sentence serve the public interests if doing so causes Schwarzkopf to contract the Delta or Omicron variant of Coronavirus? Does denying compassionate release protect him from complications his failing kidneys, high blood pressure, high cholesterol, and stroke history will cause whether individually or combined when he gets sick?

Schwarzkopf, as an inmate dependent upon the grace of prison authorities to live a healthy life is, in actuality, "powerless to protect [himself] from harm," (<u>Valentine v. Collier</u>, 2020 WL 2497541, at *3).

Schwarzkopf has exhausted his administrative remedies. He has demonstrated extraordinary and compelling reasons as defined by this District, the Second Circuit and the Fourth Circuit in <u>Braxton</u>. He will be eligible for elderly release in March of this year and home confinement in August; he has demonstrated a reliable release plan and now asks this Court to protect him from

22

continued negligence and mismanagement of COVID-19 at FCI Fort Dix by ordering immediate release based upon time served, or immediate placement on home confinement because he is, "powerless to protect himself."

Respectfully submitted,

Dated: 01/12/2022

Henning Scwarzkopf
Reg. No. 14227-509
FCI Fort Dix
PO Box 2000
Joint Base MDL, NJ 08640

### Certificate of Service

Mr. Schwarzkopf has filed this motion via the prison Mail Box Rule under <u>Houston v. Lack</u>, 478 U.S. 266 (1988) on 01/12/2022.

Please electronically submit a copy to the United States Attorney for the Eastern District of New York due to the fact that during the COVID-19 pandemic inmates do not have access to the physical Law Library where the addresses for U.S. Attorneys are held.

Henning Schwarzkopf

<u>Exhibit A</u>

Congressional Inquiries

On Tuesday, U.S. Sens. Cory Booker and Robert Menendez sent a letter to FCI Fort Dix Warden David Ortiz with raising concerns surrounding the prison's use of home confinement as well as the medical care for inmates who have tested positive for COVID-19.

As of December, 98 inmates at FCI Fort Dix have been transferred to home confinement and 89 inmates have been released through compassionate release under the CARES Act since the onset of the pandemic.

The senators called for the warden to grant home confinement to as many as eligible inmates as possible.

"The conditions at facilities in New Jersey, specifically your facility, have grown increasingly worrisome. We are still very concerned for the safety and well-being of individuals behind bars in New Jersey and across our country. It is critical that you prioritize the use of your statutory authorities to grant home confinement to as many eligible people as possible," the senators wrote.

In addition, the senators sent the warden a detailed list of questions around the BOP's home confinement program and its medical care for inmates

There are currently 2,745 inmates at the federal detention facility on Joint Base McGuire-Dix-Lakehurst.

The base is located near Burlington County towns such as Pemberton Township, Wrightstown, North Hanover, and is near the Ocean County border.

"I continue to hear from Bureau of Prisons (BOP) leadership that the situation in under control or improving, but it is clearly not," Kim said.

# Congress of the United States
## Washington, DC 20515

November 9, 2020

Mr. Michael Carvajal
Director
Federal Bureau of Prisons
320 First Street N.W.
Washington, DC 20534

Dear Mr. Carvajal,

We write today to express grave concerns regarding the Bureau of Prison's (BOP's) inadequate protocols for COVID-19 testing and inmate transfers. Specifically, we are concerned that BOP recently transferred COVID-19 positive inmates to FCI Fort Dix, which is now facing a second, and potentially severe, COVID-19 outbreak. We strongly urge you to extend the recently enacted moratorium on inmate transfers to FCI Fort Dix to also cover FCI Fairton, and that you continue the moratorium until BOP eradicates the new COVID-19 outbreak at the facility and formulates an effective and accurate testing strategy to protect both staff and inmates from future outbreaks.

Prior to October, BOP had not reported any recent COVID-19 cases among inmates or staff at FCI Fort Dix. However, in early October, BOP reportedly alerted staff at FCI Fort Dix that their facility would begin receiving inmate transfers from FCI Elkton in Ohio. FCI Elkton has been severely affected by COVID-19, with nearly 1,000 known cases among inmates and staff to date.[1] Despite the known risks of inmate transfers during a pandemic,[2] BOP transferred more than 150 inmates from FCI Elkton to FCI Fort Dix in recent weeks. On October 28, 2020, BOP confirmed in an email to congressional staff that 54 inmates tested positive for COVID-19 in the 5812 unit of FCI Fort Dix, which is reportedly the unit into which the FCI Elkton inmates were transferred. On October 29, 2020, BOP confirmed that five FCI Elkton inmates who were transferred to FCI Fort Dix on the evening of October 28, 2020 had rapid-tested positive for COVID-19 upon arrival and were placed in isolation.

While the situation is rapidly evolving, it is clear that BOP does not have an effective plan to ensure COVID-19 positive inmates are not transferred between facilities. The outbreak is now spreading within FCI Fort Dix, and as of November 9, 2020, there are at least 228 active COVID-19 cases among inmates and ten active COVID-19 cases among staff members.[3] The FCI Fort Dix employees responsible for transporting the FCI Fort Elkton transfers may have been exposed to COVID-19 in transit. All FCI Fort Dix inmates, staff, and the surrounding communities are now at increased risk for contracting COVID-19, with potentially deadly consequences.

---

[1] https://www.bop.gov/coronavirus/
[2] https://www.bop.gov/coronavirus/covid19_status.jsp
[3] https://www.bop.gov/coronavirus/

In light of the rapidly escalating crisis at FCI Fort Dix, we urge you to immediately test all FCI Fort Dix inmates and staff for COVID-19. We appreciate that BOP has instituted a temporary moratorium on transfers into FCI Fort Dix until November 23, 2020. However, rather than using an arbitrary date, we urge BOP to halt all transfers to FCI Fort Dix until BOP institutes an effective and accurate testing strategy for inmates and staff and there are no active cases at the facility. Given that BOP does not currently have an effective strategy for safe inmate transfers, we also request that BOP extend this moratorium to New Jersey's other facility, FCI Fairton.

In regards to an effective COVID-19 testing strategy, we strongly urge you to institute a plan to test all FCI Fort Dix inmates and staff on at least a biweekly basis. FCI Fort Dix's employees are frontline federal workers, and it is unacceptable that BOP is not providing them with regular COVID-19 testing. By failing to test FCI Fort Dix's employees, BOP is needlessly endangering not only these employees but their families, all inmates, and the entire surrounding community.

Additionally, we request that BOP provide detailed answers to the following questions no later than Friday, November 20, 2020:

1) Will BOP commit to halting all inmate transfers to FCI Fort Dix and FCI Fairton until the current COVID-19 outbreak at the facility has ended and there are no active cases among inmates or staff?
2) During the FCI Fort Dix transfer moratorium, will BOP also commit to halting any inmate transfers to FCI Fairton?
3) What is BOP's plan for addressing the current COVID-19 outbreak at Fort Dix, including information on testing, safety protocols, notifications to staff and inmates, as well as any future outbreaks at FCI Fort Dix and ensuring the safety of both inmates and staff?
4) In an email to congressional staff, BOP indicated that inmates who had tested positive for COVID-19 in the previous 90 days and were asymptomatic were not retested before being transferred from FCI Elkton to FCI Fort Dix. Can you verify that all FCI Elkton inmates who previously tested positive for COVID-19 received two negative COVID-19 test results before their transfer to FCI Fort Dix? Please describe, in detail, the process for testing the FCI Elkton inmates prior to their transfer to FCI Fort Dix.
5) What is BOP's overall, long-term COVID-19 testing strategy for FCI Fort Dix? How will BOP update the COVID-19 testing strategy at FCI Fort Dix in light of the recent outbreak?
6) Will BOP begin providing COVID-19 testing to FCI Fort Dix employees? If so, how often will such testing occur?
7) How has FCI Fort Dix spent the CARES Act (P.L. 116-136) funding that has been allocated the facility? Please provide a detailed breakdown.

Thank you for your prompt consideration of this urgent matter.

Sincerely,

Robert Menendez
United States Senator

Cory A. Booker
United States Senator

Frank Pallone, Jr.
Member of Congress

Bill Pascrell, Jr.
Member of Congress

Albio Sires
Member of Congress

Donald M. Payne, Jr.
Member of Congress

Donald Norcross
Member of Congress

Bonnie Watson Coleman
Member of Congress

Josh Gottheimer
Member of Congress

Mikie Sherrill
Member of Congress

Andy Kim
Member of Congress

Tom Malinowski
Member of Congress

<u>Exhibit B</u>

Former Warden Ortiz Reassigned Emailed Story from NJ.com

2/1/21 NJ.com

The top prison official at Fort Dix federal prison   where more than half the inmate population has tested positive for COVID-19 and one inmate has died from the virus   is no longer overseeing the facility, NJ Advance Media has learned.

David Ortiz, the prison's former warden, has been temporarily reassigned to the Bureau of Prisons' (BOP) northeast regional office, which is an administrative office in Philadelphia, a BOP spokesman said Monday.

"While we do not comment on specific personnel matters, we can tell you that a number of decisions have been made during the pandemic based on the BOP's correctional needs as well as other factors such as family, medical, and other concerns," Justin Long said when confirming Ortiz's absence from the prison.

Long said Ortiz started his new role Monday. He did not comment on if Ortiz is expected to return to his role as warden at Fort Dix in the future. Ortiz could not be reached for comment.

There has been increased scrutiny on Ortiz and the BOP from New Jersey's Democratic congressional delegation after the number of cases spiked significantly at the Burlington County prison in recent months. Nearly 1,500 inmates have tested positive for the virus, the most of any other facility in the federal system, according to the BOP.

"The conditions at facilities in New Jersey, specifically your facility, have grown increasingly worrisome," U.S. Sens. Cory Booker and Bob Menendez wrote to Ortiz on Jan. 12. "We are still very concerned for the safety and well-being of individuals behind bars in New Jersey and across our country."

Inmates and their families have also expressed concern to NJ Advance Media, and federal judges, over the handling of the virus at the prison, alleging there is inadequate testing, a lack of medical care and officials are not properly isolating positive inmates..

"The Bureau of Prisons is committed to ensuring the safety of all inmates in our population, our staff, and the public," said Long, the BOP spokesman. "Over the past year, the BOP has worked hard to prevent, contain, and mitigate the spread of the global pandemic."

However, Ortiz told inmates in April that social distancing would be near impossible at the prison.

"Wear your surgical face masks!" Warden wrote to inmates on April 11, according to court documents. "Since social distancing is not possible in this environment, masks will help keep you and others from spreading viruses."

There were not many cases of COVID-19 at the federal prison in the early months of the pandemic, but cases have soared over the last couple months.

Lawmakers, advocates and attorneys have noted that the rise in cases coincides with the transfer to inmates into the prison last fall, including more than a dozen of them positive with virus. Hundreds of inmates have tested positive for the virus since inmates were transferred in October to Fort Dix from Elkton, a federal prison in Ohio that was devastated by the coronavirus pandemic during the spring.

The BOP has said there was "no evidence" the transferring the inmates led to the outbreak.

Ortiz has not publicly addressed the handling of the coronavirus pandemic at Fort Dix. The BOP did not specify what his duties will be under his new role.

Exhibit C

Petitioner's Medical Records

## Medical Certificate

Patient: Schwarzkopf; Henning  DOB June 3rd, 1951

The patient above is suffering from the following medical conditions:
- state after stroke
- state after partial kidney resection due to oncocytoma
- Chronic renal insufficiency, frequent creatinine checks required
- Decompensated arterial hypertonus with increased risk of recurrent stroke and   myocardial infarction, hypertonus management with frequent check ups mandatory
- Carotid sclerosis, follow up required
- Hyperuricemia/ state after gout
- Hypercholesterolemia
- Peripheral polyneuropathy

Dr. I. Gräber MD, PhD
Certifying physician

---------------------------------------------------------------------------------------------

FROM: 14227509 SCHWARZKOPF, HENNING
TO: Health Services
SUBJECT: ***Request to Staff*** SCHWARZKOPF, HENNING, Reg# 14227509, FTD-Q-C
DATE: 11/05/2021 03:23 PM

To: Medical Service
Inmate Work Assignment: None

Hello,
this is my repeated request to provide me with the results of my recent blood and urine tests. Dr. Sood had them in front of him
when I saw him, but was not able to hand me a copy. I do not understand why I have to make these repeated (!) requests
without any response. I am concerned about my health and have the right to obtain the results of my above-mentioned tests
without any further delay.
Sincerely,
Henning Schwarzkopf

FROM: 14227509 SCHWARZKOPF, HENNING
TO: Health Services
SUBJECT: ***Request to Staff*** SCHWARZKOPF, HENNING, Reg# 14227509, FTD-Q-C
DATE: 11/17/2021 02:43 PM

To: Dr. Sood - Medical
Inmate Work Assignment: None

For yet one more time (after various email (!) and written Cop-Out requests) I respectfully request that you provide me with

1. the results of my 3 blood and 1 unrine test. There is no reason to withhold them for this extended period of time.
2. the diagnosis of the X-ray of my upper body causing Dr. Sood to state that my veins are "crooked" and to prescribe metoprol medication. What is the exact medical diagnosis? I have to right know.

Additionally and as a matter of urgency, when are you going to carry out the prescribed and APPROVED (!) on 10/22/20121 and 11/12/2021 checks:
- 2 D Echos
- CT Scan ABD *NPDD*
- Ultrasound ONsite ?

I look forward to hearing from you as soon as possible. Thank you.

---

FROM: 14227509 SCHWARZKOPF, HENNING
TO: Health Services
SUBJECT: ***Request to Staff*** SCHWARZKOPF, HENNING, Reg# 14227509, FTD-Q-C
DATE: 11/19/2021 03:50 PM

To: Insufficient and late medication
Inmate Work Assignment: None

Hello,

today, I finally received my medication. The important Amlodipine pills were late again (!) even though you should know how important they are to reduce my high blood pressure!
They were also issued in a reduced dosis (5 mg) instead of the higher dosis prescribed by my personal doctors of several years and, lately, Dr. Sood who even increased it after examining me. Now they seem to be reduced without any particular reason or, arbitrarily, without any further examination. That is not acceptable and reserve my rights resulting from this health hazard! Please issue the necessary and prescribed dosis of Amlodipine immediately!

Henning Schwarzkopf

------------------------------------------------------------------------------------------------------

FROM: 14227509 SCHWARZKOPF, HENNING
TO: Warden
SUBJECT: ***Request to Staff*** SCHWARZKOPF, HENNING, Reg# 14227509, FTD-Q-C
DATE: 11/29/2021 09:40 AM

To: Health Care
Inmate Work Assignment: None

Good morning,

so far my repeated request (via written and email messages) to receive the adequate medication has been left without a response.

Pursuant to Right No. 10 of the "Medical Services" chapter (see page 28 of the Inmate Handbook), I have the right to receive my prescribed medication.

My doctor prescribed a daily dose of 7.5 mg Amlodopin, Dr. Sood even 10 mg. Now I am receiving only 5 mg and am facing the health risk of a stroke.

Please provide me with the proper amount (7.5 mg Amlodipin) without any further delay.

Sincerely,
Henning Schwarzkopf
——SCHWARZKOPF, HENNING on 11/19/2021 3:50 PM wrote:

>

Hello,

today, I finally received my medication. The important Amlodipine pills were late again (!) even though you should know how important they are to reduce my high blood pressure!
They were also issued in a reduced dosis (5 mg) instead of the higher dosis prescribed by my personal doctors of several years and, lately, Dr. Sood who even increased it after examining me. Now they seem to be reduced without any particular reason or, arbitrarily, without any further examination. That is not acceptable and reserve my rights resulting from this health hazard!
Please issue the necessary and prescribed dosis of Amlodipine immediately!

Henning Schwarzkopf

--------------------------------------------------------------------------------

FROM: 14227509 SCHWARZKOPF, HENNING
TO: Warden
SUBJECT: ***Request to Staff*** SCHWARZKOPF, HENNING, Reg# 14227509, FTD-Q-C
DATE: 11/29/2021 10:34 AM

To: Health Examination
Inmate Work Assignment: None

Good Morning,

unfortunately, my repeated (via written and email Cop-Out) requests for an update have remained unanswered. In view of my health risk I respectfully request to have them addressed and carried out without any further delay.

Specifically, the following examinations should be carried out to avoid any risk for my health:

1. Radiation, Radiology, 2 D Echo, requested on 9/21/2021 and approved on 10/22/2021
2. Radiation, CT Scan ABD *NPO*, requested on 9/21/2021 and approved on 10/22/2021
3. Radiation, Ultrasound ONsite, requested on 9/21/2021 and approved on 10/22/2021
4. Radiation, CT Scan ABD *NOPo*, requested on 10/21/2021 and approved on 11/12/2021

Sincerely,
Henning Schwarzkopf

----------------------------------------------------------------------------------------------

FROM: 14227509 SCHWARZKOPF, HENNING
TO: Warden
SUBJECT: ***Request to Staff*** SCHWARZKOPF, HENNING, Reg# 14227509, FTD-Q-C
DATE: 12/21/2021 12:33 PM

To: Kidney Condition - Urgent
Inmate Work Assignment: None

Hello,

I refer to my recent message regarding the requested and approved nephrology examination and my sick call of more of a months, as well as the lab results concerning my kidneys.

For the last few days and, particularly today, I have experienced continuous pain in in my left kidney.

I would make another sick call, but based on my previous disappointing experiences I have no reason to believe that it will have any result whatsoever. As sad and unacceptable as that conclusion is, I have no choice but to contact you directly and request a thorough examination WITHOUT DELAY.

I do not accept a possible further detioration of my kidneys' condition simply as a result of your unwillingness or other failure to provide me with necessary and appropriate medical care. If you continue to leave my symptomps unattended, I will have to exercise my legal rights to their full extent.

Sincerely,
Henning Schwarzkopf

FROM: 14227509 SCHWARZKOPF, HENNING
TO: Warden
SUBJECT: ***Request to Staff*** SCHWARZKOPF, HENNING, Reg# 14227509, FTD-Q-C
DATE: 12/27/2021 01:51 PM

To: Kidney Condition - Repeat Request
Inmate Work Assignment: None

Hello,

Since I have not received any response to my earlier requests regarding the condition of my kidneys I am summarizing them as follows:

1. In my initial meeting with Dr. Sood I advised him of my kidney operation app. 2 years ago, thereby making him aware that there was possible health risk.

2. The lab results of my blood test showed problems with, inter alia, the creatinine levels. Yet the only medical advise I received was to drink sufficient amounts of water.

It appears that Dr. Sood applied for a nephrology consultation on October 28 which was approved a month later (!) on November 26. Today is December 27. Nothing has happened.

3. Since my kidneys hurt, I showed up for a "sick call" on November 18 and explained the situation to the officer on duty, who wrote down my name. Nothing has happened and you are in violation of my rights outlined in para. 9 listed on page 28 of your Inmate Handbook! Your conduct can be considered as your refusal to provide with me with required medical assistance (with all legal consequences).

4. As mentioned above, you have not carried out the applied, approved and necessary nephrology checks! Again, that failure to act is a gross violation of my above-mentioned rights and another example of your unaccepoptale denial to provide proper medical care while I am in your custody.

Sincerely
Henning Schwarzkopf

---------------------------------------------------------------------------------------

FROM: 14227509 SCHWARZKOPF, HENNING
TO: Warden
SUBJECT: ***Request to Staff*** SCHWARZKOPF, HENNING, Reg# 14227509, FTD-Q-C
DATE: 12/29/2021 01:16 PM

To: Kidney Condition - BP-8
Inmate Work Assignment: None

Hello,

further to my electronic message of 12/27/2021 I want let you know that this morning I handed the counselor my BP-8 form with a request to forward it to the appropriate department. For the sake of completeness I hereby reiterate my complaint set forth on the reverse page of the form as follows:

Quote:

- You have the lab results showing my critical kidney results.

- A nephrology consultation was requested by Dr. Sood on 10/18 and approved on 11/26/2021. No reaction as of today!

- I made a sick call regarding kidney pain an 11/18. No reaction as of today!

You are continuously disregarding my kidney symptoms and fail to examine and treat them as required; reference is made to paragraphs 9 and 10 of my rights outlined under "Medical Services" in the Inmate Handbook. Thus, you are in violation of my above rights and your obligation to provide proper medical care while I am in your custody.

Signed, Henning Schwarzkopf 12/29/2021

Unquote

In summary, you continue to show deliberate indifference to my health symptoms known to you.

Sincerely,
Henning Schwarzkopf

OPI: LEGAL DEPARTMENT
Number: FTD 1330.18
Date: November 18, 2014
Attachment: 1

## FCI FORT DIX, NEW JERSEY
### INFORMAL RESOLUTION FORM (BP-8)

You are advised that prior to receiving and filing a Request for
Administrative Remedy Form BP-9, you MUST ordinarily attempt to informally
resolve your complaint through your Correctional Counselor. Briefly
state ONE complaint below and list what efforts you have made to resolve
your complaint informally and state names of staff contacted.

Date form issued and initials of Correctional Counselor: _D_ 12-15-21

INMATE NAME _Henning Schwarzkopf_
REGISTER NO. _14.227-509_
BLDG. _5812_

Date the incident complained of occurred: _12/15/2021_

Complaint and relief requested: _Regarding the results of my blood test and the indications regarding my kidney, please provide me with (1) the test results of my urine test and (2) a Bence-Jones protein test without any delay._

## CORRECTIONAL COUNSELOR:

Date BP-8 returned to Correctional Counselor: _____

Efforts made to informally resolve and staff contacted: _____

_____

_____

_____

Date response given to inmate: _____

                                    _____
                                    Counselor    (sign)

Date BP-9 Issued: _____  _____
                                    Unit Manager (sign)

If complaint is NOT informally resolved: forward original attached to
BP-9 form to the Legal Assistant.

FCI FORT DIX, NEW JERSEY
INFORMAL RESOLUTION FORM (BP-8)

You are advised that prior to receiving and filing a Request for
Administrative Remedy Form BP-9, you MUST ordinarily attempt to informally
resolve your complaint through your Correctional Counselor. Briefly
state ONE complaint below and list what efforts you have made to resolve
your complaint informally and state names of staff contacted.

Date form issued and initials of Correctional Counselor: 20  12-15-21

INMATE NAME  HENNING SCHWARZKOPF
REGISTER NO.  14227-509
BLDG.  5812

Date the incident complained of occurred: 10/18 — 11/18/2021

Complaint and relief requested: _____

PLEASE SEE REVERSE ———>

_____

_____

CORRECTIONAL COUNSELOR:                    Submitted to
                                           the Counselor on
                                           12/29/2021

Date BP-8 returned to Correctional Counselor: _____

Efforts made to informally resolve and staff contacted: _____

_____

_____

_____

Date response given to inmate: _____   _____
                                            Counselor      (sign)

Date BP-9 Issued: _____  _____
                                            Unit Manager (sign)

If complaint is NOT informally resolved: forward original attached to
BP-9 form to the Legal Assistant.

- YOU HAVE THE LAB RESULTS SHOWING MY CRITICAL KIDNEY RESULTS.

- A NEPHROLOGY CONSULTATION WAS REQUESTED BY DR. SO'O ON 10/18 AND APPROVED ON 11/26/2021. NO REACTION AS OF TODAY!

- I MADE A SICK CALL REGARDING KIDNEY PAIN ON 11/18. NO REACTION AS OF TODAY!

CONCLUSION: YOU ARE CONTINUOUSLY DISREGARDING MY KIDNEY SYMPTOMS AND FAIL TO EXAMINE AND TREAT THEM AS REQUIRED; REFERENCE IS MADE TO PARAGRAPHS 9 AND 10 OF MY RIGHTS OUTLINED UNDER 'MEDICAL SERVICES' IN THE INMATE HANDBOOK. THUS, YOU ARE IN VIOLATION OF MY ABOVE RIGHTS AND YOUR OBLIGATION TO PROVIDE PROPER MEDICAL CARE WHILE I AM IN YOUR CUSTODY.

_[signature]_ 12/29/2021

INMATE REQUEST TO STAFF CDFRM

U.S. DEPARTMENT OF JUSTICE                    FEDERAL BUREAU OF PRISONS

| TO: (Name and Title of Staff Member) MEDICAL RECORDS | DATE: 12/29/2021 |
|---|---|
| FROM: HENNING SCHWARZKOPF | REGISTER NO.: 14227-509 |
| WORK ASSIGNMENT: | UNIT: J812 |

SUBJECT: (Briefly state your question or concern and the solution you are requesting. Continue on back, if necessary. Your failure to be specific may result in no action being taken. If necessary, you will be interviewed in order to successfully respond to your request.

PURSUANT TO PARAS. 5 AND 6 OF THE "MEDICAL SERVICES" OUTLINED IN THE INMATE HANDBOOK (PAGES 27 AND 28) PLEASE PROVIDE ME WITH THE RESULT AND DIAGNOSIS OF THE X-RAY EXAMINATION OF MY UPPER BODY PERFORMED ON 12/13/2021.

Submitted to the Counselor on 12/29/2021

(Do not write below this line)

DISPOSITION:

| Signature Staff Member | Date |
|---|---|

Record Copy - File; Copy - Inmate

PDF                              Prescribed by P5511

This form replaces BP-148.070 dated Oct 86
and BP-S148.070 APR 94

SECTION 6

**Exhibit D**

Emailed Article on Melson Mathis

By Noah Goldberg
New York Daily News |
Jan 10, 2021 at 11:15 PM

Melson Mathis, a federal prisoner in New Jersey, was struggling in December with what he thought were lingering COVID-19 symptoms   shortness of breath and diminished lung function   from a bout with the virus last summer.

Then on Dec. 10, he got tested again for the virus   and the results came back positive for a second time six months after his initial diagnosis, he wrote to a judge.

"Your Honor, it's worse this time, I am really experiencing more severe symptoms than before, my chest hurts and my breathing is labored," Mathis, 46, wrote.
Melson Mathis, incarcerated at FCI Fort Dix in New Jersey, has tested positive for COVID-19 for a second time.
Melson Mathis, incarcerated at FCI Fort Dix in New Jersey, has tested positive for COVID-19 for a second time. (Courtesy of Ayisha Mathis)

While massive outbreaks of coronavirus in the federal prison system have been documented, Mathis is one of a handful of prisoners to have contracted the disease twice, a rare though not unheard of occurrence, according to the Centers for Disease Control and Prevention.

In federal jails and prisons, where positive COVID-19 rates are higher than in the general population, word of recurring infections has prompted some judges to grant requests for release due to the risk of catching coronavirus a second time.

In November, Mathis, who was convicted of playing a leading role in a New York drug trafficking organization, was among hundreds of men transferred from a federal prison in Elkton, Ohio, to Fort Dix prison in New Jersey.

The controversial move was blamed for seeding a coronavirus outbreak at the Jersey prison, which recorded 232 confirmed cases in November   the largest federal prison outbreak in the country. In one unit, 217 out of 230 prisoners   94%   tested positive for COVID-19, according to court filings.

During the outbreak, Mathis tested positive again, which angered his family.
»

"I'm like, what in the world is going on in there?" his mother, Carol Mathis, 62, told the Daily News.

Two other men in federal prisons have tested positive a second time and survived, according to records and defense lawyers.

A Texas man, Ricky Lynn Miller, was serving a sentence for possession of child porn when he caught COVID-19 in June. He recovered in July, then tested positive again two months later and died Sept. 17, according to the Bureau of Prisons.

At least five men died of complications from COVID-19 at federal prisons after being listed by the bureau as "recovered," though not all those men tested positive a second time, according to a review of records by The News.

The bureau did not provide statistics on reinfections among the incarcerated population or respond to a request for comment.

But instances of a second infection have defense attorneys making arguments that their clients who already had COVID-19 are at risk of catching it again   and judges are citing it as a reason to release prisoners.

In Maryland, a judge released 65-year-old Kelvin Heyward, who already had the virus, because he could get it again.

"Mr. Heyward argues, and the government does not dispute, that a secondary contraction of COVID-19 is possible," wrote the judge.

Mathis, meanwhile, waits at Fort Dix for word on whether his judge will release him now that he's gotten COVID-19 a second time.

"I'm hoping and praying that they let him out," his mother said.

Emailed Article on Death of Myron Crosby

After months of mounting coronavirus cases, the federal prison at Fort Dix, New Jersey is reporting its first COVID-19 death.

Myron Crosby, 58, died Friday at a local hospital, the Bureau of Prisons confirmed to WNYC Monday morning. The Massachusetts native was taken in for treatment 10 days after he tested positive for the coronavirus on Dec. 28. The BOP said Crosby was initially placed in medical isolation and transferred to a hospital when he had trouble breathing.

Crosby, who was obese and had diabetes, had applied for compassionate release due to the pandemic and his poor health. Court records show his request was denied in October. A judge said Crosby who was convicted for distributing heroin hadn't served enough of his sentence to deter him from a "habit of criminality."

Fort Dix has one of the worst COVID outbreaks among all federal prisons in the country. While vaccinations began last week, more than half the men at the low-security facility have tested positive for the virus most of them within the last month.

Exhibit F

Before completing this sheet, please review Program Statement 5050.50, Compassionate Release/Reduction In Sentence, available in the law library.

## COMPASSIONATE RELEASE/REDUCTION IN SENTENCE

NAME: **Henning Schwarzkopf** UNIT: **5812** REG#: **14227-509** DATE: **12/3/21**

Who is your Physician (circle): Patel    Sceusa    (Sood)    Chinwalla    UNKNOWN

**Choose One Criteria: You can only apply under one criteria.**

Extraordinary/Compelling Circumstances:

**Medical Circumstances**

_____Terminal Medical Condition- Terminal Diagnosis with 18 months or less life expectancy.

__X__Debilitated Medical Condition – Illness that has you partially (50%) or completely (100%) disabled.

**Elderly Inmates**

_____"New Law" Elderly Inmates – 70 years old or older, and served 30 years or more of sentence.

_____Elderly with Medical Conditions – 65 years old or older and served at least 50% of sentence.

_____Other Elderly Inmate- 65 years or older and served at least 75% of sentence or the greater of 10 years.

_____Death or Incapacitation of the Family Member Caregiver of an inmate's dependent child- provide verifiable documentation the child is "suddenly" without a caretaker, the family member is in an incapacitated state and unable to care for the child.

_____Incapacitation of a Spouse or Partner – provide verifiable medical documentation of incapacitated state.

**To be completed by inmate:**

Briefly describe your medical condition or non-medical circumstance:
   **See attached**

If you have applied before, has anything changed in your medical condition since your last application (if so, describe):
_____
_____

**Proposed Release Plan (Must have ALL of the following):**

Name and contact information of who you will live with, and the last time you spoke to this person about your release plan:
   **Christine Davies**    **12/2/21**    **(305)401-8477**

Address of where you will be living: **4152 Battersea Road, Miami FL 33133-6604**

Where will you receive medical treatment (if applicable): **Miami**

How will you pay for your medical treatment (if applicable): **German health insurance**

Additional Comments:
   **See attached**
_____

Updated 10/23/2020

I am requesting Emergency Compassionate Release pursuant to §3582(c)(1)(A) and U.S.S.G. §1B13.1 due to the high-risk of COVID infection based upon the conditions of confinement at FCI Fort Dix. Specifically, I:

- Am 70 years of age
- Suffer from oncocytoma due to partial kidney resection
- Suffer from chronic venal insufficiency
- Have carotid sclerosis
- Suffer from both high blood pressure and high cholesterol
- Have a history of stroke
- Did not commit a crime of violence or a sex offense

To manage these chronic conditions I am prescribed:

- Amlodipin (5mg) - Blood pressure
- Losartan Potassium (25mg) - Blood pressure
- Metoprold Tartate (25mg) - Beta blocker
- Atorvastatin (40mg) - Cholesterol

These medications, combined with my chronic medical conditions, make me more likely to contract COVID-19 and more likely to suffer a negative outcome once contracted than younger, healthier inmates.

Respectfully submitted,

Henning Schwarzkopf
Reg. No. 14227-509

12/8/2021

Attachment

Exhibit G

# Christine Davies

305-401-8477
red_dragon11@hotmail.com
4152 Battersea Road
Miami FL 33133

January 3rd, 2022
Federal Bureau of Prisons

Re:     Henning Schwarzkopf
        14227-509

To whom it may concern

I am writing this letter on behalf of Henning Schwarzkopf, an inmate at Fort Dix. . My name is Christine Davies, and Henning has been a family friend of ours for over 40 years. My late husband was Federal Judge William Hoeveler, who served on the bench since 1977. Henning met Judge Hoeveler when he studied for a masters in law at the University of Miami when he was in his 20s and we have known him since that time. We would like to offer our home as appropriate housing for Henning's release plan through home confinement. Henning has always been a trustworthy friend to us and this case has not changed our opinion of him.

We understand that home confinement is a directive for inmates who meet certain criteria under the The March 26, 2020 Memorandum for the Director of the Bureau of Prisons from the Office of the Attorney General. Specifically, the memorandum states:

> "I am hereby directing you to prioritize the use of your various statutory authorities to grant home confinement for inmates seeking transfer in connection with ongoing COVID-19 pandemic."

It must be noted that even though this directive was written in 2020, we are still in the middle of a surge in covid cases and the risks are very high, particularly in prisons where social isolation is impossible.

Henning meets the requirements outlined for candidates for the home confinement program. Specifically:

1) Henning is of advanced age. He is 70 years old, which is an age group that is only 2.7% of the federal inmate population

2) Henning has physical illnesses which further make him a vulnerable inmate. He has had blood tests and scans while in Fort Dix which have shown that there are very serious health concerns. The medical records need to be taken into consideration. People with these medical conditions are at risk of hospitalization or death when infected with Covid.

3) Henning is not serving a term based on a violent or sex offense, nor does he have any record of violence in his life history.

4) Henning has no history of criminal conduct and prior to his term in Fort Dix, spent 10 months with an ankle monitor in New York, alone and away from his family in Germany. Because of covid restrictions , they were unable to fly to this country to see him. He was very isolated during this time, which was a form of confinement in itself. Nevertheless, he complied completely with all requests of the court. He has had no legal issues in the past and has a 5 star rating as a lawyer in Germany.

5) According to the BOP, Henning needs a viable release plan consisting of appropriate housing, and transportation to the home confinement location. I can offer transportation from Fort Dix and appropriate housing for him.

We are extremely concerned about break-through covid infections and we understand that Fort Dix has had severe outbreaks in the past. At my home I can provide a safer alternative for Henning and reduce the burden of care for the Bureau of Prisons. Additionally, we can provide him a space to work remotely in our home, so that he may resume being a contributing member of society.

I regularly attend the Episcopal Chapel of St Bede on the University of Miami campus as did my late husband. Father Frank Corbishley is very supportive and I'm sure would welcome Henning to the Chapel. He is also still conducting his services on Zoom if Henning would be restricted from going the short distance to attend in person.

Please don't hesitate to communicate with me if you have any further concerns.

Sincerely

Christine Davies

Henning Schwarzkopf 14227-509
Federal Correctional Institution
PO Box 2000
Joint Base MDL, NJ 08640

U.S. Courthouse/Attn: Clerk of Court
225 Cadman Plaza East, Room 118S
Brooklyn, NY 11201-1818



USMS

FOREVER / USA